IN THE UNITED STATES DICTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| RICHARD CAMPODONICO, ) | C/A No.: 2:17-cv-03034-DCC-MGB |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| SOUTH CAROLINA DEPARTMENT OF ) | **PRELIMINARY EXPERT REPORT BY** |
| CORRECTIONS, WARDEN WILLIE ) | **JAMES AIKEN** |
| EAGLETON, individually and/or in his ) | **James E. Aiken & Associates, Inc.** |
| official capacity as warden of Evans ) | |
| Correctional Institution, CORRECTIONAL ) | |
| OFFICER BENNETT, individually and/or ) | |
| in his official capacity as an employee of ) | |
| SCDC, CORRECTIONAL OFFICER ) | |
| PARNELL, individually and/or in his ) | |
| Official capacity as an employee of SCDC, ) | |
| and CORRECTIONAL OFFICER ) | |
| WYDELL, individually and/or in his official ) | |
| capacity as an employee of SCDC, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

**I. Introduction/Methodology**

I have been retained by the Bell Legal Group to give my expert opinion on a number of cases involving the operational and administrative performance of several correctional facilities. All of these cases involve similar failures to adequately prevent, address, and respond to deficiencies, creating substandard patterns or practices. This failure status foresees the advent of more critical events involving serious injury and possible death if corrective cause and effect measures are not taken.

Counsel for Plaintiff retained me to review materials in the above referenced litigation. More specifically, I was requested to evaluate the materials submitted by Counsel and reach preliminary expert findings/opinions in a confinement operational context, as to the circumstances involving Mr. Richard Campodonico, the facilities' failure to ensure his safety, protection, and security while he was incarcerated at Evans Correctional Institution from December 24, 2016 to August 28, 2017. It is my understanding that Mr. Campodonico is still incarcerated at Evans Correction Institution.

The approaches and methodology I would use in evaluating the issues in this proceeding are similar or identical to assessments conducted by correctional professionals in establishing expert findings, opinions, management approaches, investigative fact finding, policy and procedure development and implementation. These approaches are also used as a "check and balance" system to ascertain if corrective actions are necessary and/or valid. Examples of these approaches include but are not limited to reviewing facility related reports and legal documents, operationally assessing medical records, reviewing confinement facility logs, post orders, training materials/documents, and documents created by inmates and staff, reviewing investigative reports, assessing policy/protocols/post orders as well as procedures regarding confinement facility operations, and memoranda/incident reports detailing security issues and the actions taken to prevent, detect, respond, mitigate and stabilize the security issue and/or critical event. These approaches are also used in making expert opinion determinations, based on the lack of certain materials and validating documents, which typically indicates a failure of the confinement system to meet basic acceptable operating requirements to protect and secure inmates/staff.[1]

Professionals in the confinement facility management field also use these methods to assess basic operational and administrative performance necessary to adequately prevent, address and respond to endangerment deficiencies, such as those caused by the failure to provide a seamless and accountable medical care delivery system and inmate supervision system in practice as well as in policy. These methods are also used to ensure that corrective actions are implemented to prevent, detect and resolve grave security incidents. *(See Exhibit A* - Materials Reviewed by Expert).

## II. Expert Qualifications

I have held the following positions:

- Director of Corrections for the U. S. Virgin Islands (prison/jails)
- Commissioner of the Indiana Department of Correction (adult/juvenile)
- Deputy Regional Administrator, South Carolina Department of Corrections (managing 16 prisons ranging from super-maximum to minimum security)
- Warden, (Central Correctional Institution -CCI) State Penitentiary, South Carolina Department of Corrections (high security prison that housed the most predator, dangerous and violent inmate population in adjudicated and safekeeper (pretrial status)
- Warden, Women's Prison, South Carolina Department of Corrections (maximum, medium and minimum security population)
- Deputy Warden and Administrative Assistant to the Warden, South Carolina Department of Corrections (high security, medium and minimum security population)
- Counselor with the Comprehensive Drug Abuse Treatment Program, South Carolina Department of Corrections

---

[1] I have been advised that some discovery has not been received prior to the deadline of this report. Upon receipt of additional discovery, this report may be supplemented and revised as required.

I have over 45 (forty-five) years-experience in the management of confinement facilities and correctional systems. *(See Exhibit B - Resume).* A major focus of my career has been the assessment and restoration of facilities and systems that have experienced chronic and acute security, operational critical events and management shortfalls. These have included issues of:

- staff malfeasance
- corruption
- gang/Security Threat Group (STG) monitoring and management
- Security critical-event prevention and management
- budget shortfalls
- failure to provide inmate population access to necessary health care
- public loss of trust in the confinement system
- inmate loss of trust in the professionalism of confinement facility staff
- staff loss of trust in the professionalism of administrators
- emergency response and preparedness
- inmate disruptive and violent behavior management
- confinement facility and system culture assessment and improvement
- confinement facility and system overall performance assessment
- performance of death penalty executions of condemned inmates
- inmate classification system (design, implementation and monitoring)
- addressing civil legal complaints
- adherence with court orders
- inmate disciplinary system performance assessments
- confinement facility security technology (development, implementation and monitoring)
- new prison construction
- renovation of existing confinement facilities to enhance security performance
- confinement facility operational policy and procedure issues
- post order development, reassessment, interpretation, and monitoring
- facility operational performance assessments
- policy development and interpretation
- contraband control
- staff training and development
- evaluation of staff training
- employee productivity evaluations
- employee discipline
- confinement facility cost containment strategies
- use of force and restraint evaluation and implementation
- criminal and administrative investigations (operational evaluations) of confinement setting critical incidents
- management of overcrowded confinement facilities

I have also assisted the legislative and executive branches of government on the state and federal levels by providing expert advice regarding budgetary issues and statutory reforms regarding corrections.

3

Additionally, I have provided consulting services to the U. S. Department of Justice, National Institute of Corrections, as well as served as a private contract provider to federal, state and county jurisdictions in a number of areas including, but not limited to:

- inmate classification
- management of women offenders
- managing violent youthful offenders in adult prisons
- managing prison security systems
- prison culture change
- correctional leadership development
- assessment of security operational performance
- executive training for new and experienced wardens
- prison critical event avoidance
- management of super-maximum security prisons
- management of the hard-to-manage violent inmate
- riot/gang management
- use of force (to include lethal force) evaluation and application
- critical event prevention evaluations

I have also consulted with attorneys and rendered expert testimony in capital, criminal and civil cases. I have been qualified as an expert and provided such testimony in the states of Washington, Wyoming, Ohio, Georgia, Arizona, Delaware, North Carolina, Montana, Pennsylvania, New York, South Carolina, Indiana, Virginia, Maryland, Louisiana, Oregon, New Hampshire, Missouri, Alabama, Mississippi, Florida, Texas and the United States District Courts of Maryland, New York, Connecticut, Virginia, Ohio, South Carolina, Michigan, Arizona, West Virginia, Florida, Texas, Georgia, Alabama, Missouri, Tennessee, District of Columbia and Pennsylvania as well as the Court of Queen's Bench, Canada relative to: future danger posed to inmates, staff and the community by defendants, the ability of inmates to adjust to prison, classification of inmates to determine proper confinement levels, prison conditions, and other matters generally relating to prisons, jails, and criminal justice matters. (See Exhibit B, Resume–for a more complete list of qualifications).

## III. Correctional Principles

In making my assessment and establishing expert opinions in this matter, I relied upon the following correctional principles, which I have developed during my over 45 years working in correctional administrative (to include the positions of final responsible authority), programs, operations and security management:

- Prison officials must develop reasonable, objective, and validated measures and policies that have a direct causal relationship to objectively produce a reasonably safe environment for inmates, staff and the community;

- Prison officials must take responsibility and exercise their authority to ensure the safety of staff, inmates, and the community;

4

- Prison officials must administer prison operational policies and practices within the confines of constitutional and statutory law, government regulations, judicial mandates, and sound correctional practice;

- Prison officials must ensure that prison operational policies and practices are empirically designed and implemented to an objective degree of productivity directly related to the safety of staff, inmates and the community;

- Prison officials must verify, continually monitor prison operations in order to establish that the policies and practices are objective, empirical, and outcome-based, to directly prevent, detect, respond to, and contain security issues prior to the occurrence of a critical event involving life endangerment perils;

- Prison officials must create and maintain a posture of professional trust and integrity among stakeholders, including prison staff, inmates, the judiciary, and the general public;

- High security inmate populations often do not adhere to the regimen of desired behavior. However, prison staff must have systems and procedures available and effectively implemented to ensure the safety of inmates, staff and the community;

- All security staff, regardless of the security level of the facility, must be held to a high level of professional standard with a high degree of integrity, and intense evaluation/investigation, supervision and accountability.

This preliminary report is submitted with the understanding that confinement facilities are inherently dangerous places which house and manage individuals who have demonstrated behaviors that are in violation of law, social standards, and mores of the general society. Some prisoners may be disruptive and/or have serious criminal violations as well as length of sentence that requires them to be housed in highly secured facilities for extended periods. Inmate populations that have demonstrated a compliant, often non-violent behavior pattern over time can be housed with other inmate population with similar established behavior patterns. Regardless, confinement facilities must have adequate well-trained staff, physical plant, develop/implement protocols, procedures, and practices as well as establish systems that protect inmates/staff from harm, comply with constitutional requirements and sound correctional practices.

It is also acknowledged that prison officials are allowed a degree of operational discretion and flexibility to ensure that inmates, staff and the community are protected. The range of discretion and flexibility to invade an inmate's privacy and movement is relatively wide when compared to rights and safeguards provided to citizens in the general community. This discretion is generally granted to further ensure the safety and security of staff, prisoners and the general community.

## IV. Overview of The Critical Events

This section was based upon information provided by Counsel, however, due to numerous pages of discovery were not readable to the extent that a determination could not be achieved as to what action(s) Defendants did or did not employ regarding the issues contained in the Compliant.

Upon receipt of more legible and additional discovery information, an expert opinion will be established and submitted. According to the Compliant several incidents occurred as described below:

- Mr. Campodonico reported that he was in his cell on Christmas Eve, December 24, 2016, when inmates from another wing came into his cell to rob him of his belongings and canteen. During this attack he was stabbed multiple times with an ice pick. He reports that there were no correctional officers on his wing and that after the attack, he looked out of his cell and observed the correctional officers opening the wing door to allow the inmates who attacked him back onto their wing. He reports that both Correctional Officer Bennett and Correctional Officer Parnell were in the control room and not actually on the wing.

- SCDC Documents 7004 and 7005 show that Mr. Campodonico was not seen by medical until January 4, 2017 for his injuries. Document 7005 also states that Major West was to come to medical to discuss why Mr. Campodonico was not brought to medical after the attack.

- Mr. Campodonico again reported that on July 15, 2017 he was attacked from behind by unknown assailants and stabbed approximately twenty (20) times. He reports that the sally port doors between the wings were opened and both wings were going to the cafeteria at the same time. SCDC Document 7001 reports that Mr. Campodonico was treated by medical for multiple wounds.

- August 4, 2017, Mr. Campodonico was supposed to be housed in protective custody and was let out of his cell to go to the showers. Other inmates on the wing, who were not on protective custody, were also allowed out of their cells. Mr. Campodonico was jumped by a number of other inmates and struck in the head; again on August 4, 2017, Mr. Campodonico attempted to seek help from the correctional officers and he requested to be moved. His oral requests were denied and he was ordered to return to his cell. When Mr. Campodonico refused to return to his cell, he stated that he was grabbed by Correctional Officer Wydell (Waddell), handcuffed and slammed to the concrete floor where he struck his head and then was kicked in the face and beaten. Correctional Officer Jones was present and observed the assault by Correctional Officer Wydell (Waddell). He received no medical attention and was placed on lock up for refusing to obey an order. Mr. Campodonico filed a grievance as reflected by SCDC Document Grievances 1005.

- Mr. Campodonico again reported that on August 16, 2017, he was placed in a cell which the institution designated as a protective custody cell but was on a dorm and wing that housed mostly gang members. Mr. Campodonico's cell door was unlocked by the correctional officer to allow him to go to the showers but when he exited his cell, he noticed that other inmates' cell doors were also unlocked. As he turned to go back to his cell, he was pushed into the cell by three (3) unidentified inmates and he and his roommate were attacked and stabbed and told that they had to pay to be on PC on that wing. SCDC Document Grievances 1003 indicates that Mr. Campodonico reported the

correctional for unlocking his cell door while other cell doors were also unlocked and then leaving the wing.

- On August 28, 2017, Mr. Campodonico again reported that he was supposed to be in a cell designated for protective custody. He reports that again his cell door was unlocked by correctional officer (Johnson) while other cell doors were unlocked and that he was then attacked and beaten. The attackers told Mr. Campodonico and his roommate that they would never be safe on that wing. Mr. Campodonico states that he reported the incident.

If the above described incidents are true and if additional documents further reflect the facts as provided in the Complaint, the Defendants South Carolina Department of Corrections, Warden Willie Eagleton, and Correctional Officer Bennett, Correctional Officer Parnell, Correctional Officer Wydell (Waddell) knew and/or should have known that Mr. Campodonico was at risk well beyond the inherent risks of a prison environment. Additionally, as stated above, some of the documents provided as part of the discovery were not legible and may further have a direct impact upon rendering findings and an expert opinion.

Assuming the above described incidents are true and additional documents further reflect the facts as provided in the Complaint, the Defendants South Carolina Department of Corrections, Warden Willie Eagleton, and Correctional Officer Bennett, Correctional Officer Parnell, Correctional Officer Wydell (Waddell) knew and/or should have known that Mr. Campodonico was at risk well beyond the inherent risks of a prison environment.

In my opinion to a reasonable degree of certainty, subject to the understanding that I am basing my opinion solely on the limited documents which I am able to review and on the condition that additional documents further reflect the facts as described, Defendants South Carolina Department of Corrections, Warden Willie Eagleton, and Correctional Officer Bennett, Correctional Officer Parnell, Correctional Officer Wydell (Waddell) failed to meet a minimum standard of care to marginally ensure the safety and secure protection of Mr. Campodonico and, therefore, acted with deliberate indifference to Mr. Campodonico's safety.

Additionally, as stated above, some of the documents provided as part of the discovery were not legible and may further have a direct impact upon rendering findings and an expert opinion. It is my understanding that discovery is ongoing in this case, so I, therefore, reserve the right to supplement or amend this report upon receipt of additional relevant materials.

JAMES E. AIKEN
James E. Aiken & Associates, Inc.

May 2, 2018