## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Richard Campodonico, | ) | Case No. 2:17-cv-03034-DCC-MGB |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | **AND ORDER** |
| South Carolina Department of | ) | |
| Corrections, Warden Willie Eagleton, | ) | |
| Officer Bennett, Officer Parnell, and | ) | |
| Officer Wydell, | ) | |
| | ) | |
| **Defendants.** | ) | |

This action has been filed by Plaintiff, through counsel, pursuant to 42 U.S.C. § 1983 and the South Carolina Tort Claims Act ("SCTCA"), S.C. Code Ann. §§ 15-78-10 *et seq.* (Dkt. No. 1-1.) Currently before the Court is Defendants' Motion for Summary Judgment/Motion to Stay Discovery (Dkt. No. 22). Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B) and Local Rule 73.02(B)(2)(d), D.S.C., this matter has been assigned to the undersigned for all pretrial proceedings. For the reasons set forth below, the undersigned recommends that summary judgment be denied on the basis that the administrative remedies were unavailable to Plaintiff with respect to the incidents at issue. In addition, the undersigned denies the Motion to Stay and, instead, extends the remaining deadlines in the scheduling order by six weeks in order to allow the parties additional time to develop the record and to submit any other dispositive motions.

## BACKGROUND

This civil action arises from six instances of alleged inmate stabbings or attacks Plaintiff suffered over a nine month period from December 24, 2016 through August 28, 2017, while incarcerated at Evans Correctional Institution. Plaintiff alleges that "Evans Correctional

Institution has a long history of violence among inmates housed in the institution and many times the violence is encouraged and/or condoned by the Defendants as the perpetrators are not punished and many times the violent acts were done after notice and in many instances it appears that Defendants were complicit in the violent acts and/or knew said acts were going to occur and did nothing to prevent the acts." (Dkt. No. 1-1 ¶ 9.) Plaintiff alleges that Defendants failed "to keep weapons out of the hands of inmates housed at Evans Correctional Institution." (*Id*. ¶ 10.)

According to Plaintiff, Defendants acted in a grossly negligent manner in various ways, including "failing to provide protection and security for the Plaintiff" and "failing to have a sufficient number of trained correctional officers to adequately respond to incidents such as what occurred to Plaintiff." (*Id*. ¶¶ 85, 89, 93, 97, 101.) Plaintiff alleges, *inter alia*, that such conduct violates his constitutional rights. (*Id*. ¶¶ 86-87, 90-91, 94-95, 98-99, 102-103.) Plaintiff seeks injunctive relief as well as actual, consequential, special damages, and punitive damages. (*Id*. at 30–31.)

Plaintiff filed this action in the Fourth Judicial Circuit Court of Common Pleas on September 21, 2017, and it was removed to this Court on November 8, 2017. (Dkt. No. 1.) On September 28, 2018, Defendants filed a Motion for Summary Judgment/Motion to Stay Discovery (Dkt. No. 22). This motion has been fully briefed and is ripe for disposition.

## STANDARD OF REVIEW

Defendants seek dismissal pursuant to Rule 12(b)(1) and Rule 56 of the Federal Rules of Civil Procedure on the basis that Plaintiff has failed to exhaust his administrative remedies. A plaintiff is not required to show he satisfied the Prison Litigation Reform Act ("PLRA") in his

complaint. *Wilcox v. Brown*, 877 F.3d 161, 167 (4th Cir. 2017) (citation omitted). Failure to exhaust under the PLRA is an affirmative defense, and "a district court, at the pleadings stage, may not dismiss a claim based on the plaintiff's failure to affirmatively show exhaustion, even when the court has first allowed the plaintiff to address the issue." *Id.* (citing *Custis v. Davis*, 851 F.3d 358, 361-62 (4th Cir. 2017)). "Nevertheless, despite the fact that failure-to-exhaust is an affirmative defense, a prisoner's complaint may be dismissed for non-exhaustion in the rare case where failure to exhaust is apparent from the face of the complaint." *Wilcox*, 877 F.3d at 167 (citation and quotation omitted).

Here, Plaintiff's failure to exhaust is not apparent from the face of the complaint, as evidenced by the numerous exhibits submitted on the issue. Accordingly, the undersigned finds this motion is more appropriately addressed under the summary judgment standard of Rule 56, Fed. R. Civ. P. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). To survive a motion for summary judgment asserting he failed to exhaust his administrative remedies, an inmate is required to produce evidence in response to the motion that refutes the claim that he failed to exhaust. *See Hill v. Haynes*, 380 F. App'x 268, 270 (4th Cir. 2010) (holding that "to withstand a motion for summary judgment, the non-moving party must produce competent evidence

3

sufficient to reveal the existence of a genuine issue of material fact for trial" (citing Fed. R. Civ. P. 56(e)(2))).

In ruling on a motion for summary judgment, "'the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor.'" *Id.* (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)); *see also Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123–24 (4th Cir. 1990). Conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

## ANALYSIS

Defendants seek dismissal of this lawsuit on the basis that Plaintiff failed to exhaust his administrative remedies with respect to each incident at issue. Defendants also ask that the Court stay discovery on the merits until the exhaustion issue has been resolved.

### A. Exhaustion of Administrative Remedies

#### 1. Exhaustion of Administrative Remedy Process

Section 1997e(a) of the Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Through the enactment of this statute, "Congress has mandated exhaustion clearly enough, regardless of

4

the relief offered through administrative procedures." *Booth v. Churner*, 532 U.S. 731, 741 (2001); *see also Porter v. Nussle*, 534 U.S. 516 (2002).

Exhaustion is defined by each prison's grievance procedure, not the PLRA; a prisoner must comply with his prison's grievance procedure to exhaust his administrative remedies. *Jones v. Bock*, 549 U.S. 199, 218 (2007). An inmate's failure to "properly take each step within the administrative process . . . bars, and does not just postpone, suit under § 1983." *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002); *see also White v. McGinnis*, 131 F.3d 593, 595 (6th Cir. 1997) (upholding dismissal of an inmate's complaint because the inmate failed to proceed beyond the first step in the administrative grievance process).

The South Carolina Department of Corrections' ("SCDC") grievance procedure is outlined in SCDC Policy GA-01.12 ("Inmate Grievance System"). (Dkt. No. 29-6.) Subject to certain exceptions, the Inmate Grievance System requires that inmates initially attempt to resolve grievances informally by "submitting a Request to Staff Member Form[1] to the appropriate supervisor/staff within eight (8) working days of the incident." (*Id.* ¶ 13.2.)

> Exceptions to the eight (8) working day time limit requirement will be made for grievances concerning policies/procedures, and PREA allegations. Exceptions may also be made for incident grievances, provided that the inmate can show reasonable cause, i.e., inmate physically unable to initiate grievance due to hospitalization, court appearance, etc. All exceptions will be determined by the Branch Chief/Designee of the Inmate Grievance Branch.

(*Id.* ¶ 13.10.)

Informal resolution is not required, however, when "the matter involves allegations of criminal activity." (*Id.*) With respect to criminal activity complaints, the inmate must file Form

---

1 The parties refer to these forms as "kiosk requests" in their submitted briefings and throughout the record.

10-5 Step 1 within five working days of the alleged incident. (*Id.*) The Inmate Grievance System provides:

> Any grievance which alleges criminal activity will be referred immediately to the Chief/designee, Inmate Grievance Branch. The IGC will note on the grievance tracking CRT screen that the grievance has been forwarded to the Inmate Grievance Branch for possible investigation by the Division of Investigations and the date on which the grievance was forwarded. The Chief/Designee, Inmate Grievance Branch, will consult with the Division of Investigations to determine if a criminal investigation would be appropriate. If deemed appropriate, the grievance will be forwarded to the Division of Investigations, to be handled in accordance with applicable SCDC policies/procedures. The grievance will be held in abeyance until the Division of Investigations completes their review/investigation. . . . .

> If it is determined by the Division of Investigations that the grievance will be referred to SLED for review/investigation, the grievant will be notified in a Step 1 Warden's response that the grievance has been forwarded to SLED. As the time frame for SLED to conduct an investigation is out of the control of SCDC, the IGC will forward the original grievance to the Inmate Grievance Branch and the grievance will be administratively closed until SCDC receives the final report. The grievant will then receive a Step 2 response to the investigation and will be given an opportunity to appeal to the next level if dissatisfied with the response.

(*Id.* ¶¶ 15, 15.1.) If it is determined that a criminal investigation is not required, the grievance will be processed in accordance with the procedures applicable to non-criminal activity grievances. (*Id.*)

> Certain grievances are considered to be "an emergency grievance." (*Id.* ¶ 14.)

> An emergency will encompass, but is not limited to, situations, actions, or conditions in which any person's health, safety, or welfare is threatened or in serious danger. It is the responsibility of the grievant to demonstrate the factors creating the substantial risk of personal injury or other serious and irreparable harm. The IGC will fax, or scan and email a copy of the grievance to the Chief/Designee, Inmate Grievance Branch, to determine if a substantial risk or serious harm is present and warrants the grievance being processed as an 'emergency.'

(*Id.* ¶ 14.1)

If a grievance is found to be an emergency, "it will be forwarded immediately to the Warden if resolution of the issue(s) is within the Warden's capability to provide." The Warden is to conduct any necessary investigation and "respond to the inmate within no more than seven (7) working days after receipt of the emergency grievance by the IGC. If an emergency grievance involves the safety of an inmate, the Warden will take immediate steps to implement the appropriate precautions or temporary actions without waiting for an investigation to be conducted." (*Id.* ¶ 14.2.)

If it is not within the Warden's capability to resolve the emergency grievance, the emergency grievance

> will be faxed or scanned and emailed without substantive review immediately to the Chief/designee, Inmate Grievance Branch, for review and forwarded to the responsible official. The responsible official will conduct an investigation and will respond to the inmate within seven (7) working days after receipt of the grievance by the IGC. The response will be faxed or scanned and emailed by the Chief, Inmate Grievance Branch/Designee, to the IGC, who will deliver the response to the inmate and have him/her sign it acknowledging receipt.

> If the grievance is not determined to be an emergency, the IGC will be notified, who will note in his/her response that the grievance was not deemed to be an emergency, and the grievance will then be routinely processed through the system as if it were a normal grievance.

(*Id.* ¶¶ 14.3, 14.4)

If an inmate files a Step 1 grievance that does not involve criminal activity, the Warden is required to respond in writing within 45 days and advise the inmate of his right to appeal to the next level:

> The Warden will respond to the grievant in writing (in the space provided on SCDC Form 10-5, Step 1), indicating in detail the rationale for the decision rendered and any recommended remedies. The grievant will also be informed of his/her rights to appeal to the next level. The Warden will respond to the grievant no later than 45 days from the date the grievance was formally entered into the

> OMS system by the IGC. The response will be served by the IGC to the grievant, within ten (10) calendar days, and the grievant will sign and date the response acknowledging receipt. The IGC will maintain the original grievance for the inmate's grievance file and a copy will be given to the inmate.

(*Id.* ¶ 13.5)

The inmate may then appeal by filing a Form 10.5(a) Step 2 appeal to the Inmate Grievance Coordinator within five days of the receipt of the response. (*Id.* ¶ 13.7) The appeal is referred to the "responsible official" who is required to make a final decision within 90 days. (*Id.*)

The Inmate Grievance System provides that "A grievance will be considered to be abandoned" where "[t]he inmate refuses to actively participate in the resolution process if the inmate's participation is deemed vital to the process." (*Id.* ¶ 16.2.)

### 2.  Unavailability of Administrative Remedy

At issue here is whether the administrative remedies were available to Plaintiff. "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008). In *Ross v. Blake*, the Supreme Court set forth three scenarios where the administrative process is considered "unavailable": (1) the administrative process "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) the administrative process is so opaque that no ordinary prisoner can discern or navigate through the process; and (3) the "administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation or intimidation." 136 S.Ct. 1850, 1853–54 (2016).

To prove unavailability, the inmate must "adduce facts showing that he was prevented, through no fault of his own, from availing himself of that procedure." *Graham v. Gentry*, 413 Fed. App'x 660, 663 (4th Cir. 2011). "The district court is 'obligated to ensure that any defects in exhaustion were not procured from the action or inaction of prison officials.'" *Zander v. Lappin*, 415 F. App'x 491, 492 (4th Cir. 2011) (quoting *Aquilar–Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007)).

### 3. Analysis

In support of their motion for summary judgment based on Plaintiff's failure to exhaust administrative remedies, Defendants have submitted affidavits from Argie Graves, the Inmate Grievance Coordinator at Evans Correctional Institution (Dkt. No. 29-1); Defendant Sargent Addison Waddell[2] (Dkt. No. 29-2); John Lighthill, an Agent with Division of Investigations, Police Services (Dkt. No. 29-3); Sherman Anderson, the Chief of the Inmate Grievance Branch for the SCDC (Dkt. No. 29-5); and Major Charles West (Dkt. No. 29-6). Defendants also have submitted Plaintiff's grievances at issue (Dkt. No. 29-4); certain kiosk requests from Plaintiff (Dkt. No. 29-19); and Plaintiff's "bed history" at SCDC (Dkt. No. 29-18).[3]

In his response to Defendants' motion, Plaintiff submitted his own affidavit (Dkt. 25-1) as well as affidavits from several inmates "filed in other cases involving Evans Correctional Institution" (Dkt. Nos. 25 at 17; 25-4 through 25-15).

---

2 Plaintiff refers to Officer Wadell as Officer Wydell in his briefs. The undersigned refers to Defendant Officer Wydell as he is referenced by the parties, both as Officer Wadell and Officer Wydell.

3 Defendants fail to provide *any* citations corresponding to the docket entry numbers of their many exhibits, (Dkt. Nos. 22-1; 29), thereby making it incredibly difficult to locate in the record the evidence referenced in their briefings. The parties are instructed that all filings with the Court should include citations to the entry docket numbers for any referenced exhibits.

Upon consideration of the submitted evidence, the undersigned makes the following findings and recommendations:

### a. Incidents One through Four

#### i. Incident One

The parties dispute whether Plaintiff filed an untimely grievance after he was allegedly stabbed by two inmates on December 24, 2016. (Dkt. No. 1-1 at 8.) Plaintiff's grievance regarding this incident is dated "2-12-17" next to Plaintiff's signature. (Dkt. No. 29-4 at 7.) However, the form indicates the grievance was received on January 25, 2017. (*Id.*) In the grievance, Plaintiff states that Officer Bennett allowed 2 inmates to stab Plaintiff over 20 times in his back, neck and legs and then the officer allowed those inmates to leave after opening the wing door. (*Id.*) The grievance states that Plaintiff was scared and did not know who to trust or why the attack happened. (*Id.*) He states Sargent Hudson came into his room after Christmas at "count time," saw Plaintiff's wounds, and left. (*Id.*) He further states that Officer Rogers later came into his room and also did not report Plaintiff's injuries. (*Id.*) Plaintiff states that he stayed in his room until January 4, 2018, and was eventually taken to Kirkland Correctional Institution for an x-ray. (*Id.*) Under "action requested," Plaintiff asks for a transfer and asks that all the officers involved be held responsible. (*Id.*)[4]

The Inmate Grievance Coordinator ("IGC") sent Plaintiff a response to the grievance on January 26, 2017, stating "A copy of this grievance has been forwarded to the Office of General

---

[4] It is unclear whether Defendants contend Plaintiff should have first filed a kiosk request with respect to all of the incidents at issue before filing a grievance. Plaintiff assert that this requirement was excepted because each incident concerned criminal activity; specifically, criminal beatings and stabbings by fellow inmates. (Dkt. No. 25 at 10.) The undersigned agrees that allegedly suffering a beating and stabbing from a fellow inmate would likely fall under the category of "criminal activity" contemplated by the Inmate Grievance System.

Counsel, Inmate Grievance Branch for joint review by the Office of Inspector General, Division of Police Services ("OIGPS") due to the allegations made in it. The time frame . . . for responses to grievances are not applied to grievances that have been sent to OIGPS." (*Id.*)

On January 27, 2017, the grievance was forwarded to Beth Tidwell, Administrative Coordinator for the Inmate Grievance Branch ("IGB") to determine whether the grievance would be investigated. (Dkt. No. 29-4 at 6.) According to Anderson, Plaintiff submitted a kiosk request on April 8, 2017, stating "I wrote a grievance in February and have not gotten a response. Can you please tell me why its [sic] taking so long for a response." (Dkt. No. 22-3 at 10.) Anderson avers that Plaintiff received the following response to this request: "It was forwarded to Police Services for review, please remain patient." (*Id.*) Anderson further avers that, on July 3, 2017, Plaintiff submitted another kiosk request asking about the status of his February grievance, to which he received a response on July 5, 2017, stating that the grievance was forwarded to the Office of General Counsel and that the "time frame for responses to grievances are not applied to grievances sent to OIGPS." (*Id.* at 11.) Defendants have not provided any of the actual kiosk responses cited by Anderson.

Almost ten months after Plaintiff filed his Step-1 grievance, on October 23, 2017, the "inmate grievance review routing slip" was returned to Felecia McKie at the IGB, stating that A/C Carter had reviewed the grievance and found "no investigation" because "Inmate is uncooperative and says he does not want to file any charges, he just wants to be moved. Warden has been notified so he can work on transferring him." (Dkt. No. 29-4 at 5.) There is no evidence in the record that Plaintiff received a Step-2 response to the investigation, thereby giving him an opportunity to appeal to the next level if he was dissatisfied with the response.

(Dkt. No. 25-2 ¶ 15.1.) Rather, Anderson avers that Plaintiff "received an oral response on October 23, 2017, that no investigation was warranted based upon his failure to cooperate." (Dkt. No. 22-3 at 10.)

In his affidavit, Plaintiff avers that he did not immediately receive medical attention following the attack, "but was eventually allowed to go to medical." (Dkt. No. 25-1 at 5.) He was taken to "Kirkland Correctional Institution for an x-ray before being returned back to Evans Correctional Institution." (*Id*.) He did not want to be in the same dorm and wing where he had been attacked, so he "was placed in the holding cell" and eventually was allowed to go to the Santee dorm. (*Id.*) Plaintiff avers that he asked for the forms to file a grievance regarding the incident, but he was not given any forms. (*Id.*) Plaintiff further avers that he "was on lock up following the incident and when I was allowed out for an hour, I went to the kiosk and filed my Request to Staff. When I did not get a response to the Request to Staff, I then filed the Step 1 grievance. Since SCDC has forty-five days to answer a Request to Staff, my filing of the Step 1 grievance on January 25, 2017 was timely." (*Id.*)

In response, Defendants point to Sherman Anderson's affidavit, in which he avers that Plaintiff did not submit any kiosk requests in January of 2017 regarding the incident from December of 2016. (Dkt. No. 29-5 at 13.) Defendants have provided three unrelated kiosk requests submitted by Plaintiff in January of 2017. (Dkt. No. 29-19.) Anderson further cites Plaintiff's "bed history" which indicates that Plaintiff was not placed in lock up following the incident. (*Id.*) Anderson further avers that Plaintiff "abandoned [this] grievance by refusing to cooperate and participate with the investigator. Inmates are not transferred to other facilities simply because they want to be transferred." (*Id.*)

12

### ii.  Incident Two

The parties dispute whether Plaintiff filed a timely grievance after he was allegedly stabbed twenty times on July 15, 2017, while standing in line to go to the cafeteria. (Dkt. No. 1-1 at 9.) This incident occurred while Plaintiff was still waiting to hear the outcome of his grievance related to the December 24, 2016 stabbing. According to Anderson, on August 3, 2017, Plaintiff submitted a kiosk request stating "Please get me away from this dorm and yard. I am scared for my life. They have keys to open the doors in here made outta treys [sic]. They are going to kill me I seen keys with my own eyes hurry been stabbed 2 different times here." (Dkt. No. 22-3.) Anderson avers that Plaintiff received a response to this request on August 25, 2017, stating "Re-submit if not corrected." (*Id.*)

Plaintiff filed a grievance relating to the July 15, 2017 stabbing on August 7, 2018. (Dkt. No. 29-4 at 2) Plaintiff's grievance states that Plaintiff was stabbed twenty times in the Santee unit "when my dorm was called for chow." He states he was "stabbed 5 months earlier on Xmas eve." (*Id.*) Plaintiff states that the prison officials are not protecting him and that Major West, Lieutenant Brown, and Lieutenant Wheeler "all know my situation and they keep putting my life in danger." (*Id.*)

The Inmate Grievance Coordinator ("IGC") sent Plaintiff a response to the grievance on August 9, 2017, stating "A copy of this grievance has been forwarded to the Office of General Counsel, Inmate Grievance Branch for joint review by the Office of Inspector General, Division of Police Services ("OIGPS") due to the allegations made in it. The time frame  . . . for responses to grievances are not applied to grievances that have been sent to OIGPS." (*Id.*)

Almost four months later, on October 23, 2017, the "inmate grievance review routing slip" regarding this grievance was returned to Felecia McKie at the IGB, stating that A/C Carter had reviewed the grievance and found "no investigation" because "Inmate is uncooperative and says he does not want to file any charges, he just wants to be moved. Warden has been notified so he can work on transferring him." (Dkt. No. 29-4 at 1.) According to Anderson, on November 3, 2017, "Warden Stonebreaker responded to [Plaintiff's] grievance: Your grievance was forwarded to Police Services for review. Documentation indicates you became uncooperative and do not want to file any charges. An administrative transfer has been requested. Therefore, I consider this matter resolved. If not satisfied with my response, please see Step 5 below." (Dkt. No. 22-3 at 15.) Defendants have not provided the actual documentation of this response, rather Anderson has only averred to this statement from Warden Stonebreaker.

In his affidavit, Plaintiff avers that following this attack, he was placed in lock up or what he thought was at least protective custody. (Dkt. No. 25-1 at 6.) Plaintiff avers that he was told "that there was not room in [Restrictive Housing Unit] and that I would remain locked in my room/cell and only allowed out when no one else was out. When I was able to obtain a grievance form, I filed the grievance. SCDC says that it was untimely, but it is not always possible to access the system." (*Id.*)

Anderson avers that Plaintiff "abandoned [this] grievance by refusing to cooperate and participate with the investigator. Inmates are not transferred to other facilities simply because they want to be transferred." (Dkt. No. 19-5 at 13.)

### iii.  Incidents Three and Four

The parties dispute whether Plaintiff failed to exhaust his administrative remedies despite filing a timely grievance following two alleged incidents that occurred on August 4, 2017. Again, this incident occurred while Plaintiff was still waiting to hear the outcome of his grievances relating to both the December 24, 2016 stabbing and the July 15, 2017 stabbing. Plaintiff alleges that on August 4, 2017, he was attacked by other inmates in his cell on August 4, 2017, and Officer Wydell attacked Plaintiff later that day when Plaintiff went to him to report the inmate assault. (Dkt. No. 1-1 at 10.) Plaintiff filed a grievance on August 7, 2017, stating that he was attacked by inmates and that when he told Officer Wydell "what happened he told me I was going back to my room . . . put me in cuffs, slammed my head on ground, kicked me in my face." (Dkt. No. 29-4 at 2.) The grievance asks that charges be brought against Officer Wadell for assault. (*Id.*)

Defendants have not included any documentation showing that Plaintiff received a timely response to this grievance. In his initial affidavit filed by Defendants on September 28, 2018, Anderson avers that because this grievance "asserted staff misconduct, [it] was forwarded to General Counsel and Police Services. (Dkt. No. 22-3 at 16.) According to Anderson, Plaintiff "received this oral response" to this grievance from Agent C. Carter at Police Services on October 23, 2017, in which he stated "Inmate is uncooperative and says he does not want to file any charges, he just wants to be moved. Warden has been notified so he can work on transferring him. No investigation." (*Id.*)

Almost three months later, on October 23, 2017, the "inmate grievance review routing slip" regarding this grievance was returned to Felecia McKie at the IGB, stating that A/C Carter had reviewed the grievance and found "no investigation" because "Inmate is uncooperative and

15

says he does not want to file any charges, he just wants to be moved. Warden has been notified so he can work on transferring him." (Dkt. No. 29-4 at 1.) There is no evidence in the record that Plaintiff received a Step-2 response to the investigation, thereby giving him an opportunity to appeal to the next level if he was dissatisfied with the response. (Dkt. No. 25-2 ¶ 15.1.)

Defendants point to Sherman Anderson's affidavit, in which he avers that Plaintiff "refused to participate with Investigator Carter during the investigation." (Dkt. No. 22-3 at 17.) Anderson further avers that Plaintiff "abandoned [this] grievance by refusing to cooperate and participate with the investigator. Inmates are not transferred to other facilities simply because they want to be transferred." (Dkt. No. 26-5 at 14.)

### iv.  Investigation of Incidents One through Four

The parties dispute the events that occurred when the above incidents were investigated. In his affidavit, Plaintiff avers that after he filed the grievance relating to the August 4, 2017 incidents, he was

> visited by four investigators from police services. I objected to meeting with them without my attorney being present, my grievance provided sufficient information for police services to know what had happened. Instead of being concerned that I had been attacked again by gang members, they were more concerned with trying to intimidate me into signing an agreement to get me to drop my complaints against the correctional officers. I did not refuse to cooperate with police service. I asked to have my attorney present. What I did refuse to do was sign the document they wanted me to sign which would dismiss my complaint. I did not abandon my grievance.

(Dkt. No. 25-1 at 6–7.)

Defendants dispute Plaintiff's version of events and have submitted John Lighthill's affidavit, in which Lighthill avers that he interviewed Plaintiff about his grievances on August 11, 2017. (Dkt. No. 29-3 at 2.) Curiously, while Anderson submitted an initial affidavit

16

indicating A.C. Carter investigated certain grievances, there is no affidavit from Carter in the record, and Lighthill's affidavit indicates that he was the sole investigator of the above grievances. Indeed, Lighthill avers that he did not interview Plaintiff with three other investigators. (*Id.*) According to Lighthill, Plaintiff "refused to cooperate with the investigation and did not wish to press charges against any of his attackers. [Plaintiff] refused to identify any of his alleged attackers. [Plaintiff's] sole request was that he be transferred to another facility. . . . [Plaintiff] did NOT ask for his attorney during his interview." (*Id.*)

> Lighthill further avers that if
>
> an inmate refuses to cooperate with the investigation, they will be counseled about signing a Criminal Process Withdrawal Form should they wish to not prosecute the offenders. The inmate is not required to sign a Criminal Process Withdrawal Form. The choice is entirely up to the inmate victim. By electing to sign a Criminal Process Withdrawal Form, an inmate is advised that Police Services will close its investigation and will not pursue the perpetrators any further. . . . In this case, . . . [Plaintiff] refused to sign a Criminal Process Withdrawal Form. The investigation into the [aforementioned] grievances was closed. No one intimidated or threatened [Plaintiff] to either prosecute or withdraw his claims.

(*Id.* at 3.)

> Lighthill avers that Plaintiff's grievances
>
> do NOT provide sufficient specific information for Police Services to complete an investigation. Non-specific and vague reference to '2 inmates stab me over 20 times,' or 'someone punched me in the ear,' or 'I was stabbed,' does not help investigators identify the responsible inmate(s) who allegedly assaulted [Plaintiff]. [Plaintiff] did name an employee (Wadell) who he claims used excessive force or assaulted him. Because [Plaintiff] failed to cooperate or give any additional information about the alleged assault by Sgt. Waddell, no further investigation was warranted into this claim. [Plaintiff's] cooperation is essential to properly and appropriately investigate any allegations, including allegations that a SCDC staff member used excessive force.

(*Id.* at 3–4.)

In his affidavit, Lighthill only specifically references the grievances relating to the above four incidents. (*Id.*) Lighthill's affidavit does not appear to address the last two incidents at issue. Indeed, those incidents occurred after the August 11, 2017 interview, as discussed below.

### v. Recommendations

Defendants assert that Plaintiff's "failure to [identify] his attackers and cooperate with investigators has denied them with any opportunity to address his claims at the administrative level." (Dkt. No. 29 at 13.) They further contend that Plaintiff "refused to actively participate in the resolution process when he was contacted by an investigator and his cooperation was vital to the process of identifying and punishing his alleged attackers." (*Id.* at 2.) For these reasons, Defendants assert that Plaintiff effectively abandoned these grievances pursuant to the Inmate Grievance System, and therefore has not exhausted his administrative remedies with respect to these incidents. (Dkt. No. 25-2 ¶ 16.2).

In making these arguments, Defendants ignore that the above incidents all involved certain alleged conduct by prison officials, whom Plaintiff expressly identified in his grievances. Specifically, Plaintiff's grievance regarding the December 24, 2016 incident named three prison officials: one who was apparently complicit in the attack on Plaintiff and two others who ignored Plaintiff's injuries following the attack. The grievance asked in part that the officers involved be held responsible. Plaintiff's grievance regarding the July 15, 2017 incident named three prison officials who "all know my situation and they keep putting my life in danger." Plaintiff's grievance regarding the August 4, 2017 incidents expressly names Officer Wadell and provides details as to how he assaulted Plaintiff. It is unclear why Defendants were deprived "any opportunity to address [these] claims," in light of Plaintiff's express

18

identification of the prison officials at issue in the above incidents. Indeed, there is no evidence in the record that *any* prison official *ever* attempted to investigate any of the allegations against the named officers by speaking to them directly.

By the time the investigation into these incidents occurred, almost ten months after the initial stabbing and after three more assaults had occurred, Plaintiff apparently was reluctant to identify his inmate attackers. In his affidavit, Plaintiff states that he "told them time and time again that it is not safe to reveal who attacks you, even if you know." (Dkt. No. 25-1 at 8.) Plaintiff avers that he does "not believe I would be safe to reveal the identities of any of the individuals who attacked me as long as I remained at Evans Correctional Institution. In fact, it appears from the fact that I continued to be subjected to attacks that even reporting an attack without revealing the identities of the attackers put me at risk." (*Id.* at 9.) Even without the specific inmates' names, Defendants still had the information about the prison officials at issue from Plaintiff's grievances and the details provided in those grievances. Importantly, it is prison officials who are the subject of the instant action, not any inmate attackers. Further, Plaintiff disputes that he refused to cooperate with police services. Rather, Plaintiff avers that he asked to have his attorney present and refused to sign anything that would result in the dismissal of his complaint.

In *Wilcox*, the Fourth Circuit Court of Appeals explained that a grievance "generally need only be sufficient to alert the prison to the nature of the wrong for which redress is sought." 877 F.3d at 167 n.4.

> The main purpose of the PLRA's exhaustion requirement is "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful

record." *Moore*, 517 F.3d at 726 (internal quotation marks omitted). Accordingly, to satisfy the exhaustion requirement, grievances generally need only be sufficient to "alert[ ] the prison to the nature of the wrong for which redress is sought." *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002). "In order to exhaust their remedies, prisoners need not file multiple, successive grievances raising the same issue (such as prison conditions or policies) if the objectionable condition is continuing." *Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013) (collecting cases). "Thus, once a prison has received notice of, and an opportunity to correct, a problem, the prisoner has satisfied the purpose of the exhaustion requirement." *Id.*

*Id.*

Here, even without the names of the inmate attackers, the prison still received notice of, and an opportunity to correct, the alleged problems with the specific prison officials identified by Plaintiff in his grievances. Thus, pursuant to *Wilcox*, Plaintiff satisfied the purpose of the exhaustion requirement with respect to the above incidents. *See Langley v. Huntington Police Dep't*, No. 3:17-CV-03520, 2018 WL 652866, at *15 (S.D.W. Va. Jan. 9, 2018) (finding pursuant to *Wilcox* that "Plaintiff's filing of grievances alleging improper treatment of injuries sustained in his automobile accident provided the prison with adequate notice, and the opportunity to correct, Plaintiff's alleged problem of receiving inadequate medical treatment of those injuries leading to the development of pneumonia, empyema, sepsis, and a collapsed lung"), *adopted by* 2018 WL 650208 (S.D.W. Va. Jan. 31, 2018).

Further, with respect to the December 24, 2016 incident and the August 4, 2017 incidents, there is no evidence that the prison provided Plaintiff with an opportunity to file a Step-2 response to the investigation. The prison's failure to investigate any of the allegations against the named officers by speaking to them directly, as well as its failure to provide Plaintiff the opportunity to properly appeal the results of its investigation, indicate that the Inmate Grievance Procedure operated as a "dead end" in this instance, rendering the administrative

20

remedy process unavailable to Plaintiff with respect to these incidents. *See Ross*, 136 S.Ct. at 1859–60 (explaining that administrative remedies may be deemed "unavailable" when the administrative process "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"); *see also Wilson v. Eagleton*, No. 1:18-cv-0050-RMG, 2018 WL 4908277, at *3 (D.S.C. Oct. 10, 2018) (finding administrative remedies were unavailable to the plaintiff where "the record supports finding that Defendants were 'consistently unwilling' to engage with Plaintiff's grievances, which Defendants were empowered to consider, but nonetheless 'declined [ ] to exercise' their authority to review"); *Mann v. Scott*, No. 0:14-cv-3474-RMG, 2015 WL 5165198, at *5 (D.S.C. Sept. 1, 2015) ("The Court finds that the prison's failure to respond to Plaintiff's RTS's made an administrative remedy unavailable in this case, excusing his resulting failure to exhaust prior to filing suit. The Motion for Summary Judgment is denied as to its administrative exhaustion grounds."); *Martin v. McFadden*, No. 0:15-cv-1570-PMD-PJG, 2016 WL 3727493, at *2 (D.S.C. June 17, 2016) (denying defendants' motion for summary judgment where prisoner received a response to his grievance "long after the time period established by SCDC policy"); *Widener v. City of Bristol*, No. 1:13-cv-00053, 2014 WL 3058560, at *3–4 (W.D. Va. July 2, 2014) (denying defendants' summary judgment motion based on non-exhaustion in light of evidence "that the plaintiff attempted to fully exhaust the administrative remedies available to him before filing this suit" and the defendants' failure to meet their burden of proving that the plaintiff's efforts did not constitute exhaustion); *Allah v. Comm. of Virginia*, No. 2:10-cv-00075, 2011 WL 251214, at *4–5 (W.D. Va. Jan. 25, 2011) (denying defendant's motion for summary judgment based on non-exhaustion in light of the prison's failure to respond to plaintiff's request form and other

activities by which the prison "frustrated" the plaintiff's efforts to pursue his grievance); *cf.*
*Oliver v. Va. Dep't of Corr.*, Case No. 3:09-cv-00056, 2010 WL 1417833, at *6 n.10 (W.D. Va.
Apr. 6, 2010) ("To be sure, if prison officials impede a prisoner's attempts to exhaust by . . .
failing to respond to a proper grievance, a prisoner may be excused from exhaustion
requirements").

For these reasons, the undersigned finds that Plaintiff's claims should be deemed
exhausted with respect to the December 24, 2016, July 15, 2017, and August 4, 2017 incidents
and denies summary judgment as to his claims arising from these incidents.

### b. Incident Five

The parties dispute whether Plaintiff failed to exhaust his administrative remedies
despite filing a timely grievance after he was allegedly stabbed by other inmates in his cell on
August 16, 2017. (Dkt. No. 1-1 at 12.) This incident occurred after Lighthill conducted his
August 11, 2017 interview with Plaintiff regarding his allegations as to the four assaults he had
previously suffered. Plaintiff alleges his roommate was also stabbed in the August 16, 2017
attack. Plaintiff alleges that when they showed their wounds to Lieutenant Moultrie, he accused
them of fighting with each other. (*Id.*)

According to Anderson, Plaintiff submitted a kiosk request on August 18, 2017, stating
"I was stabbed on the 16th and I continuously told everyone I am scared for my life. Officer left
our door unlocked 3 inmates come to my room and stab me and my roommate. We are on PC
and door was never to be opened. Please get me away from here. And we still never got medical
attention." (Dkt. No. 22-3 at 18.) Anderson avers that Plaintiff received a response to this
request on August 25, 2017, stating "See Unit manager/counselor for assistance." (*Id.*) Plaintiff

filed a grievance on or about August 21, 2017, in which he referenced the prior stabbings in December of 2016 and July and August of 2017. (Dkt. No. 29-4 at 10.) The grievance further states that Plaintiff was stabbed in his cell and references officers generally. (*Id.*) However, part of the grievance appears to be whited out and cannot be discerned.

The Inmate Grievance Coordinator ("IGC") sent Plaintiff a response to the grievance on September 5, 2017, stating "A copy of this grievance has been forwarded to the Office of General Counsel, Inmate Grievance Branch for joint review by the Office of Inspector General, Division of Police Services ("OIGPS") due to the allegations made in it. The time frame . . . for responses to grievances are not applied to grievances that have been sent to OIGPS." (Dkt. No. 29-4 at 10.)

Defendants have not included any documentation showing that Plaintiff's grievance was investigated. In his initial affidavit filed by Defendants on September 28, 2018, Anderson avers that Plaintiff "received an oral response" to this grievance on June 7, 2018, almost *one year* after the alleged assault occurred, that stated "I spoke with inmate at Evans CI and he stated he was stabbed at Evans on two separate occasions. He did not want to press any charges or write a statement, he wants to be transferred from Evans. Warden notified, inmate on PC." (Dkt. No. 22-3 at 19.) This allegation is not included in Anderson's subsequent affidavit, filed by Defendants on December 3, 2018. (Dkt. No. 29-5.) In their brief, Defendants assert that Plaintiff cannot argue his administrative remedies were unavailable given that he "fail[ed] to provide specific identifying information about his alleged attackers." (Dkt. No. 29 at 5, 29.) They further appear to assert that Plaintiff failed to cooperate with investigators about this alleged attack. (*Id.*)

Here, Defendants have failed to submit any documents indicating that the above incident was actually investigated. Rather, they merely cite to Anderson's initial affidavit, providing an uncited quote that Plaintiff received an "oral response to [his] grievance" from an unidentified individual. The quote given by Anderson does not expressly provide that an investigation was conducted, and that Plaintiff effectively abandoned his claims regarding this incident by refusing to actively participate in the resolution process with respect to the August 16, 2017 incident. Further, Defendants have not submitted any evidence that Plaintiff received a Step-2 response to the investigation, thereby giving him an opportunity to appeal to the next level if he was dissatisfied with the response. (Dkt. No. 25-2 ¶ 15.1.)

Accordingly, the prison officials' failure to investigate the August 16, 2017 incident and/or provide Plaintiff with a Step-2 response to the investigation indicates that the Inmate Grievance Procedure operated as a "dead end" in this instance, rendering the administrative remedy process unavailable to Plaintiff with respect to this incident. *See Ross*, 136 S.Ct. at 1859–60; *see also Wilson*, 2018 WL 4908277, at *3; *Mann*, 2015 WL 5165198, at *5; *Martin*, 2016 WL 3727493, at *2; *Widener*, 2014 WL 3058560, at *3–4; *Allah*, 2011 WL 251214, at *4–5; *cf. Oliver*, 2010 WL 1417833, at *6 n.10.

In sum, the undersigned finds that Plaintiff's claims should be deemed exhausted with respect to the August 16, 2017 incident and denies summary judgment as to his claims arising from this incident.

### c. Incident Six

The parties dispute whether Plaintiff's administrative remedies were unavailable to him after he was allegedly stabbed by other inmates on August 28, 2017. (Dkt. No. 1-1 at 13.) This

24

incident occurred after Lighthill conducted his August 11, 2017 interview, and after Plaintiff was again attacked twelve days earlier. In Plaintiff's affidavit, he appears to admit that he did not file any kiosk requests or grievances after the August 28, 2017 stabbing. Plaintiff avers that "I was locked back in my cell so had no access to the kiosk machine. I also did not have access to any forms to file a grievance." (Dkt. No. 25-1 at 8.)

Anderson avers that Plaintiff filed a kiosk request on September 15, 2017, to the "Legal Materials Department," stating: "I need 100 more sheets of paper and 2 pens. I used my last because I was behind. I really need these things. I am on PC in Waxhaw B 121. Need items delivered." (Dkt. No. 22-3 at 20.) According to Anderson, Plaintiff received a response to this request on October 5, 2017, stating, "I will add you to the next list." (*Id.*) Defendants argue that Plaintiff's claims arising from this incident should be dismissed for failure to exhaust his administrative remedies. (Dkt. Nos. 22-1 at 8; 29 at 6.)

The submitted evidence indicates that Plaintiff indeed was confined to his cell following the alleged assault and therefore did not have access to any forms to file a grievance. Based on this finding, the undersigned finds that the Inmate Grievance Procedure operated as a "dead end" in this instance, rendering the administrative remedy process unavailable to Plaintiff with respect to this incident. *See Ross*, 136 S.Ct. at 1859–60; *see also Wilson*, 2018 WL 4908277, at *3; *Mann*, 2015 WL 5165198, at *5; *Martin*, 2016 WL 3727493, at *2; *Widener*, 2014 WL 3058560, at *3–4; *Allah*, 2011 WL 251214, at *4–5; *cf. Oliver*, 2010 WL 1417833, at *6 n.10.

In sum, the undersigned finds that Plaintiff's claims should be deemed exhausted with respect to the August 28, 2017 incident and denies summary judgment as to his claims arising from this incident.

### B.  Motion to Stay Discovery on the Merits

Defendants ask that the Court stay the discovery deadline in the Scheduling Order (Dkt. No. 20) "until such time as the issue of exhaustion has been determined." (Dkt. No. 22-1 at 16.) Defendants further appear to argue that an evidentiary hearing will be necessary to resolve the exhaustion issue, before summary judgment can be denied. (Dkt. No. 29 at 24.) However, courts within this district routinely deny motions for summary judgment on exhaustion grounds without conducting an evidentiary hearing. *See*, *e.g.*, *Wilson*, 2018 WL 4908277, at *3; *Mann*, No. 2015 WL 5165198, at *5; *Martin v. McFadden*, 2016 WL 3727493, at *2. Further, as demonstrated above, the evidence submitted by the parties is sufficient to make findings as to the exhaustion issue.

While the exhaustion issue has now been resolved at this level of review, the undersigned recognizes that the discovery deadline set forth in the Amended Scheduling Order is only a few weeks away. (Dkt. No. 20.) This is in part due to Defendant requesting and receiving an additional two months to file a reply brief in support of its Motion for Summary Judgment. (Dkt. Nos. 26; 28.) Accordingly, the undersigned finds it appropriate to extend the remaining deadlines in the scheduling order by six weeks in order to allow the parties additional time to develop the record and to submit any other dispositive motions. Thus, the discovery deadline is now February 11, 2019, dispositive motions are due by March 11, 2019, and mediation is due by February 18, 2019. Defendants' Motion to Stay Discovery on the Merits (Dkt. No. 22-1) is therefore denied.

## CONCLUSION

Based on the foregoing, it is RECOMMENDED that Defendants' Motion for Summary Judgment (Dkt. No. 22) be DENIED. Specifically, the undersigned finds that Plaintiff's administrative remedies were "unavailable" to him with respect to the alleged incidents at issue, and, therefore, his claims arising from those incidents should be deemed exhausted. Summary judgment should therefore be denied.

IT IS SO RECOMMENDED.

In addition, Defendants' Motion to Stay the Discovery Deadline is DENIED. Instead, the undersigned extends the remaining deadlines in the scheduling order by six weeks in order to allow the parties additional time to develop the record and to submit any other dispositive motions. Thus, the discovery deadline is now February 11, 2019, dispositive motions are due by March 11, 2019, and mediation is due by February 18, 2019.

IT IS SO ORDERED.

_____
MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE

December 27, 2018
Charleston, South Carolina

27

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).